IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNNE WINNER and DESTINY JENNINGS, | : | CIVIL ACTION |
| on their own behalf and on behalf of all others | : | |
| similarly situated | : | |
| | : | |
| v. | : | |
| | : | |
| KOHL'S DEPARTMENT STORES, INC. | : | No. 16-1541 |

**MEMORANDUM**

Padova, J.                                                        **August  , 2017**

Defendant, Kohl's Department Stores, Inc. ("Kohl's") moves to dismiss the First Amended Complaint ("FAC") filed by Lynne Winner and Destiny Jennings under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted or, in the alternative, under Rule 12(b)(1) for lack of standing/subject matter jurisdiction. The case is filed as a class action alleging that Kohl's sent unauthorized autodialed telemarketing text messages to Plaintiffs' cellular telephones in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), and its implementing regulations. For the following reasons, the Motion is granted and the FAC is dismissed pursuant to Rule 12(b)(1).

## I.    FACTS

### A.    The FAC

In the FAC, Plaintiffs allege that Plaintiff Lynne Winner ("Winner") is a consumer residing in Collegeville, Pennsylvania. (FAC ¶ 6.) Plaintiff Destiny Jennings ("Jennings") is a consumer residing in Jacksonville, Florida. (Id. ¶ 7.) Kohl's is a Delaware corporation headquartered in Menomonee Falls, Wisconsin. (Id. ¶ 8.)

In the four years prior to the filing of Winner's and Jennings's initial Complaint, Kohl's began sending both Plaintiffs telemarketing text messages to their cellular telephones. (Id. ¶¶ 22, 27-28, 30-31, 46-51.) Kohl's had advertised to consumers the ability to earn frequent-shopper "points" by downloading its mobile application and texting the word "APP" to receive instructions regarding the application. (Id. ¶ 23.) The bottom of the advertisement contained a "disclaimer" which Plaintiffs characterize as "barely visible and unreadable." (Id. ¶ 26.)

Plaintiff Winner texted the "APP" message to Kohl's on October 24, 2014, and, within 15 minutes, Kohl's sent her a text message (1) advertising its mobile application and its "Yes2YouRewards" promotions program, and (2) directing her to click on a link in the text message "[t]o enroll in Yes2You." (Id. ¶ 27.) It then sent a separate text message advertising its "Mobile Sale Alerts" program, directing her to text "Save30" to participate in "saving sent straight to your phone!" (Id. ¶ 28.) Shortly thereafter, Kohl's received a text message from Winner's cellular telephone number stating "SAVE30." (Id. ¶ 29.) It then began sending Winner five to seven text messages a month stylized as "KohlALERTS." (Id. ¶¶ 30-31.) Winner alleges that she "repeatedly requested that Kohl's stop sending messages to her, but her requests went unheeded." (Id. ¶ 32.) She also visited a Kohl's store and asked an employee to get the text messages to stop, but the Kohl's employee was unable help make the text messages stop. (Id. ¶ 33.) On March 24, 2016, after receiving a "STOP" message from Winner's phone, Kohl's stopped sending her text messages. (Id. ¶ 34.) Winner alleges that she did not intentionally sign up to receive Defendant's autodialed telemarketing text messages, Kohl's never obtained her signed

written consent to send her the texts, and Kohl's never provided her with any disclosures required for a valid electronic signature. (Id. ¶¶ 37-39.)

On November 22, 2014, Kohl's received a message stating "SAVE07" from Plaintiff Jennings's cellular telephone number. (Id. ¶ 46.) "SAVE07" is one of Kohl's "calls to action" that initiates the sending of text messages to consumers. (Id. ¶ 47.) Plaintiffs allege that, as part of Defendant's corporate marketing strategy, it "routinely used such 'calls to action' that contained small print." (Id. ¶ 48.) After receiving the "SAVE07" message from Jennings's cellular telephone number, Kohl's sent Jennings a text message "Welcome to Kohl's Mobile Alerts! . . . Get 7 msgs per month. Reply HELP for HELP. STOP to cancel." (Id. ¶ 49.) Kohl's then sent Jennings a separate text message advertising sales promotions on its website. (Id. ¶ 50.) Thereafter, Kohl's sent Jennings approximately seven messages a month advertising various sales promotions. (Id. ¶ 51.)

Plaintiffs allege that the text messages Kohl's sent them constituted telemarketing as they advertised sales and promotions available at its retail stores and on its website. (Id. ¶¶ 40, 57.) The messages were automated, part of Defendant's corporate direct marketing strategy, and were not individualized to the Plaintiffs. (Id. ¶¶ 41-43, 58-59.) The messages were sent using an automatic telephone dialing system, which has the capacity to store or produce telephone numbers to be texted, using a random or sequential generator, or from a database of numbers, and to text thousands of such numbers without human intervention. (Id. ¶¶ 44-45, 60, 64-68.) "Defendant acquired Plaintiffs' numbers, stored them in a databased connected to its telephonic or computer system, and then used its system to send identical text

messages to Plaintiffs' and thousands of other consumers' cellular telephones automatically and without human intervention." (Id. ¶ 63.) No human was involved in the sending of Defendant's text messages to Plaintiffs, who received identical text messages which were the same messages received by thousands of other consumers who were enrolled in Defendant's telemarketing text messaging campaign. (Id. ¶ 64.)

Plaintiffs assert that they were annoyed by Defendant's messages and considered them spam. (Id. ¶¶ 35, 54.) They further allege they were never clearly and conspicuously informed that they were enrolling to receive automated telemarketing text messages to their cellular telephones. (Id. ¶¶ 36, 55.) Neither Plaintiff intentionally signed up for Defendant's telemarketing text messages, the messages came as a surprise and inconvenience, and became a concern to Plaintiffs. (Id. ¶¶ 37, 56.) They assert that Kohl's never obtained either Plaintiff's signed, written consent to receive telemarketing text messages, and never provided Plaintiffs with any disclosures required for a valid electronic signature. (Id. ¶¶ 38-39, 61.)

B.    The Parties' Stipulation

Following Defendant's filing of a Motion and a supporting declaration to dismiss the original Complaint in this matter for lack of standing, and the scheduling of an evidentiary hearing thereon, the parties entered into a Stipulation of Facts (Docket Entry 25 ("Stipulation")) in which they agreed as follows:

1.    On Oct. 24, 2014, at 2:05 PM, Kohl's received an incoming text message, containing the word "APP," from Ms. Winner's mobile phone number.

2.    Kohl's had advertised to consumers the ability to earn frequent-shopper "points" by downloading Kohl's mobile application and requested that consumers

text the word "APP" to Kohl's to receive instructions as to how to download the mobile application.

3.     The following is a sample advertisement[1] from Kohl's that asked consumers to text the word "APP" to Kohl's to receive these instructions:



4.     In response to the "APP" message from Ms. Winner's phone, within 15 minutes of receipt of that message, Kohl's transmitted two text messages to Ms. Winner's phone number, stating as follows:

KOHLS: Thanks for texting! To enroll in Yes2You Rewards click the link download the Kohl's App then sign in or create an account. http://bit.ly/1CXVMLK

*** 

KohlsALERTS: Get more savings sent straight to your phone! Text SAVE30 to opt in to our Mobile Sale Alerts. Receive 5-7 msgs/mon. Msg&Data Rates May

---

[1] The small print at the bottom of the advertisement states:

 "You will receive two to three auto-dialed text messages sent to your mobile number.  Participation not required to make a purchase.  You must be 18 years or older to text Kohl's.  Reply HELP for help, reply STOP to cancel.  Msg&Data Rates May Apply.  See Kohl's.com/mobile for mobile Terms and Conditions."

The Stipulation does not state the original font size of the advertisement.

Apply.

5.      Shortly after Kohl's sent the second message, Kohl's received from Ms. Winner's phone a text message reading "SAVE30."

6.      After receiving that "SAVE30" message, Kohl's commenced sending text messages to Ms. Winner's phone at the rate of five to seven messages per month.

7.      The messages sent to and received by Ms. Winner appeared as follows:





8.      On at least one occasion, Ms. Winner redeemed a sales offer transmitted to

her by text message, receiving $10 off of a $25 purchase on or about November 9,

2014.

9.      Ms. Winner contends that she had repeatedly requested that Kohl's stop sending messages to her, but her requests went unheeded.

10.     On March 24, 2016, Kohl's received from Ms. Winner's phone a text message reading "STOP." Kohl's has no record of any other request allegedly made by Ms. Winner for Kohl's to stop sending text messages to her phone number.

11.     Within minutes of receiving that message, Kohl's sent Ms. Winner's phone a final text message confirming that she had unsubscribed from the text message program.

12.     Kohl's has sent Ms. Winner's phone no text messages since March 24, 2016.

13.     Ms. Winner contends that she was annoyed at receiving the messages and considered them spam.

14.     On November 22, 2014, at 11:49 AM, Kohl's received an incoming text message, containing the term "SAVE07," from Ms. Jennings mobile phone number.

15.     "SAVE07" is one of Kohl's "calls to action" that initiates the sending of text messages.

16.     The following are examples of calls to action that featured the keyword SAVE07:









17.     In response to the "SAVE07" message from Ms. Jennings' phone, within

15 minutes of receipt of that message, Kohl's transmitted two text messages to

Ms. Jennings' phone number, stating as follows (or substantially similar thereto):

KohlsAlerts: Welcome to Kohl's Mobile Alerts! Keep up w/ Kohl's savings.
Msg&Data Rates May Apply. Get 7 msgs per month. Reply HELP for HELP.
STOP to cancel.

*** 

KohlsAlerts: Sign-up offer: Get 15% off at Kohls.com. Use code SMS2145 until
12/06. Terms: www.kohls.com/sms. Reply HELP for HELP STOP to cancel.

18.     Kohl's commenced sending Ms. Jennings approximately seven messages

per month. The messages were identical to or substantially similar to the

messages received by Ms. Winner.

19.     Kohl's never received a "STOP" message from Ms. Jennings' phone.

20.     Kohl's ceased sending text messages to Ms. Jennings' phone on April 4,

2016, the date on which she filed the Complaint in this action.

21.     Ms. Jennings contends that she was annoyed at receiving the messages and

considered them spam.

(Stipulation ¶¶ 1-21.)

## II.     STANDARD OF REVIEW

The jurisdictional portion of Kohl's Motion seeks dismissal of the FAC pursuant to

Fed. R. Civ. P. 12(b)(1) because Plaintiffs lack standing.[2]   "'A motion to dismiss for want of

---

[2] We review Defendant's Rule 12(b)(1) argument first.  See Curtis v. Unionville-Chadds
Ford Sch. Dist., Civ. A. No. 12-4786, 2013 WL 1874919, at *3 (E.D. Pa. May 1, 2013) ("When a
motion under Rule 12 is 'based on more than one ground, the court should consider the Rule
12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter
jurisdiction, the accompanying defenses and objections become moot and do not need to be

standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.'" Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (alteration in original) (quoting Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)). It is the plaintiffs' burden to prove standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). In order to survive a motion to dismiss, Plaintiffs must demonstrate that they possess the requisite stake in the outcome of their suits to have standing by showing they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (stating these three elements are the "irreducible constitutional minimum" of standing) (citing Lujan, 504 U.S. at 560-61); see also Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013); Constitution Party of Pa., 757 F.3d at 360. An injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted); Spokeo, 136 S. Ct. at 1545 ("[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both concrete *and* particularized." (emphasis in original).)

Whether a motion raises a "facial" attack or a "factual" attack on standing determines the burden of proof and standard of review. Constitution Party of Pa., 757 F.3d at 357-58 (citing In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)). A facial attack considers only "a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the courts" due to some jurisdictional defect. Id. at 358. This type of attack occurs prior to the filing of an answer or a challenge to the factual allegations of a complaint. Id. (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 889-92 (3d

---

determined.'") (quoting Jeffrey Banks, Ltd. v. Jos. A. Bank Clothiers, Inc., 619 F. Supp. 998, 1001 n.7 (D. Md. 1985)).

Cir. 1977)).  It is judged under the same standard as a motion to dismiss pursuant to Rule 12(b)(6).  Id.  However, a factual attack concerns "'the actual failure of a plaintiff's claims to comport [factually] with the jurisdictional prerequisites.'"  Id. (alteration in original) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)).  In such a case, a court may weigh the alleged facts, and consider evidence outside the pleadings.  Id.  In deciding a factual attack, the non-moving party's allegations receive no presumption of truthfulness.  Mortensen, 549 F.2d at 891.  "[P]laintiff has the burden of persuasion to convince the court it has jurisdiction."  Gould Elec., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted).

## III.    ANALYSIS

Kohl's Motion asserts a factual attack.  It argues, based on the FAC and the Stipulation, that Plaintiffs did not suffer an injury in fact as a result of receiving the autodialed telemarketing text messages from Kohls' because they asked Kohl's to send them the messages that they received.  Defendant argues that its calls to action fully comply with the Federal Communications Commission's ("FCC") guidance on what constitutes written consent under the TCPA.  Because Plaintiffs admit in the FAC and in the Stipulation that they consented to receiving the messages, Kohl's argues they have suffered no injury-in-fact to support their standing to bring their claims.

Congress enacted the TCPA "to protect individual consumers from receiving intrusive and unwanted calls."  Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 268 (3d Cir. 2013) (citing Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372-73 (2012)); see also Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009) (stating that "the TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls" (citing S. Rep. No. 102-178 at 2 (1991), reprinted in 1991 U.S.C.C.A.N. 1968)).  The TCPA makes it unlawful for any person "to make any call . . . using any automatic

telephone dialing system . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service" without "the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A)(iii).  A text message has been held to be a "call" within the meaning of the TCPA.  <u>Gomez v. Campbell-Ewald Co.</u>, 768 F.3d 871, 874 (9th Cir. 2014) (citing <u>Satterfield</u>, 569 F.3d at 952.)  Thus, to state a TCPA claim, plaintiff must allege that "(1) the defendant called [or texted] a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." <u>Meyer v. Portfolio Recovery Assocs., LLC</u>, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)).

"Congress authorized the [FCC] to implement rules and regulations enforcing the TCPA." <u>Gager,</u> 727 F.3d at 268 (citing 47 U.S.C. § 227(b)(2)).  The implementing regulation defines the term "prior express written consent" as follows:

> The term **prior express written consent means an agreement**, in writing, **bearing the signature of the person called that clearly authorizes** the seller to deliver or cause to be delivered to the person called **advertisements** or telemarketing messages **using an automatic telephone dialing system** or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

> (i) The written agreement **shall include a clear and conspicuous disclosure** informing the person signing that:

> > (A) By executing the agreement, **such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system** or an artificial or prerecorded voice; and

> > (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) **The term "signature" shall include an electronic or digital form of signature**, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

47 C.F.R. § 64.1200(f)(8) (emphasis added).

The FCC issued a Report and Order on February 15, 2012 stating that the determination of whether proper consent is given to receive advertising text messages requires that (1) the consent was obtained following a clear and conspicuous disclosure of the consequences of providing consent; and (2) the consent was "obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." In the Matter of Rules and Regulations Implementing the TCPA of 1991, 27 FCC Rcd. 1830, 1844 ¶ 33 (F.C.C. Feb. 15, 2012) (quotation omitted). The Report and Order further provides that "consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording." Id. ¶ 34 (stating that "Allowing documentation of consent under the E-SIGN Act [15 U.S.C. § 7001] will minimize the costs and burdens of acquiring prior express written consent for autodialed or prerecorded telemarketing calls while protecting the privacy interests of consumers. Because it greatly minimizes the burdens of acquiring written consent, commenters generally support using electronic signatures consistent with the E-SIGN Act. We conclude that the E-SIGN Act significantly facilitates our written consent requirement, while minimizing any additional costs associated with implementing the requirement." (footnote omitted)). The FCC then reaffirmed, in a Report and Order dated July 10, 2015, that the disclosures necessary as a precursor to consent "must tell consumers the telemarketing will be done with autodialer equipment and that consent is not a condition of purchase." In the Matter of Rules and

Regulations Implementing the TCPA of 1991, 30 FCC Rcd. 7961, 8012-13 ¶ 98 (F.C.C. July 10, 2015) ("FCC 2015 Order").

The E-Sign Act provides that, for any transaction affecting interstate or foreign commerce, "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a); see also Prudential Ins. Co. of Am. v. Prusky, 413 F. Supp. 2d 489, 494 (E.D. Pa. 2005) ("The purpose of the Act is to protect transactions from legal challenges that are solely based on the electronic form of the agreement."); Levy-Tatum v. Navient & Sallie Mae Bank, Civ. A. No. 15-3794, 2016 WL 75231, at *5 (E.D. Pa. Jan. 7, 2016) ("The E-Sign Act simply establishes that contracts and signatures cannot be denied legal effect merely because they are in electronic form." (citation omitted)). The Act contains a provision detailing that, "if a statute, regulation, or other rule of law requires that information relating to a transaction" be provided to a consumer in writing:

> **the use of an electronic record** to provide or make available (whichever is required) such information **satisfies the requirement that such information be in writing if—**
>
>> (A) the **consumer has affirmatively consented** to such use and has not withdrawn such consent;
>>
>> (B) **the consumer, prior to consenting, is provided with a clear and conspicuous statement—**
>>
>>> (i) **informing the consumer of** (I) any right or option of the consumer to have the record provided or made available on paper or in nonelectronic form, and (II) **the right of the consumer to withdraw the consent** to have the record provided or made available in an electronic form and of any conditions, consequences (which may include termination of the parties' relationship), or fees in the event of such withdrawal;

(ii) **informing the consumer of whether the consent applies (I) only to the particular transaction** which gave rise to the obligation to provide the record, or (II) to identified categories of records that may be provided or made available during the course of the parties' relationship;

(iii) **describing the procedures the consumer must use to withdraw consent** as provided in clause (i) and to update information needed to contact the consumer electronically; and
(iv) informing the consumer (I) how, after the consent, the consumer may, upon request, obtain a paper copy of an electronic record, and (II) whether any fee will be charged for such copy;

(C) **the consumer**—

(i) prior to consenting, is provided with a statement of the hardware and software requirements for access to and retention of the electronic records; and

(ii) **consents electronically, or confirms his or her consent electronically**, in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent;

15 U.S.C. § 7001(c)(1) (emphasis added.)

We find that Plaintiff Winner and Plaintiff Jennings expressly consented to receive Defendant's autodialed calls to action telemarketing texts. The facts contained in the Stipulation establish that both Winner and Jennings gave prior express consent under the TCPA through a method made permissible by the E-Sign Act. Because they consented to receiving the texts, Plaintiffs can show no concrete and particularized injury-in-fact and thus have not established that they have standing to pursue the claims asserted in the FAC.

The Stipulation establishes that Winner sent Kohl's a text message, containing the word "APP" from her mobile phone number. (Stip. ¶ 1.) Her text was sent in response to an

advertisement directing customers to text "APP." (Id. ¶ 2.) The advertisement stated that, (1) by doing so, the customer "will receive two to three auto-dialed text messages" to set up their participation;[3] (2) "Participation is not required to make a purchase;" (3) customers could "Reply **HELP** for help, reply **STOP** to cancel;" (4) message and data rates may apply; and (5) the terms and conditions of the program were available on Kohl's website. (Id. ¶ 3.) The advertisement inviting her to text "APP" also directed Plaintiff to Kohl's website for the terms and conditions applicable to the program. (Id.) In response to Winner's "APP" text, Kohl's transmitted two text messages to Winner's phone number, one of which instructed her to text "SAVE30" if she wished to participate in the calls to action program, and Kohl's then received from Ms. Winner's phone a text message reading "SAVE30." (Id. ¶¶ 4-5.) Each telemarketing text Kohl's sent thereafter instructed her to text "STOP" if she wished to stop receiving the telemarketing texts. (Id. ¶ 7.)

We conclude that Winner's actions enrolling in Defendant's calls to action program constituted prior express consent under the TCPA. The "written agreement," in the form of the text messages she received after she texted "APP," included a clear and conspicuous disclosure informing her that, by sending the authorizing "SAVE30" text she was authorizing Kohl's to deliver to her five to seven telemarketing texts each month by an automatic telephone dialing system. (Id. ¶ 4 ("Text SAVE30 to opt in to our Mobile Sale Alerts. Receive 5-7 msgs/mon.").) It also incorporated by reference the terms and conditions of the program. (Id. ¶ 3 ("See Kohls.com/mobile for mobile Terms and Conditions.").) These disclosures were sufficient to

---

[3] We note that Plaintiffs argue in their Response that "[t]he APP message from Ms. Winner authorized Kohl's to send one (1) response message. . . . However, Kohl's did not send one message; it sent two." (Pls. Resp. at 9 (citing FCC 2015 Order at ¶ 106 n.363). Plaintiffs argue that Winner did not consent to receiving the second message. This argument contradicts the Stipulation and is rejected. The parties stipulated that the "APP" message informed the customer that she would "receive two to three auto-dialed text messages." (Stip. ¶ 3.)

satisfy the requirement of the TCPA implementing regulation that there be "clear and conspicuous disclosure" that by "executing the agreement such person authorizes the seller to deliver . . . telemarketing [texts] using an automatic telephone dialing system." 47 C.F.R. § 64.1200(f)(8)(i)(A). These disclosures also satisfied the requirement that there be a clear and conspicuous disclosure that a purchase was not necessary to participate in the program. 47 C.F.R. § 64.1200(f)(8)(i)(B). (See Stip. ¶ 3.)

The sequence of the texts is important to our analysis. Defendant's response text was sent only after Winner's initial "APP" keyword text. Defendant's response text required that the consumer send the "Save30" text before Defendant began to sending autodialed telemarketing texts. We find that including the words "Terms and Conditions" and the link to the website in the ad, along with the disclosure in the responsive text that the consumer would receive five to seven texts per month, is sufficient to provide a consumer with "a clear and conspicuous statement" that the consumer has consented to receiving autodialed telemarketing texts. Moreover, Defendant's second text advised consumers to send the second "Save30" keyword text after the material that disclosed the terms and conditions were electronically made available to them. (Stip. ¶¶ 3-4.) Finally, those terms and conditions include a clear and conspicuous statement that consumers will receive autodialed telemarketing texts and provides instructions how to stop receiving them. (Id. ¶ 3.)

We conclude that the stipulated facts also establish that Winner "signed" the express written consent agreement in a manner permissible under the E-Sign Act. Winner's texting "SAVE30" constituted her electronic signature affirmatively consenting to such use, and was sent after she was notified of the terms and conditions of the program, including her right to withdraw

the consent and the procedures the consumer must use to do so, i.e., text the word "STOP." 15 U.S.C. § 7001(c)(1)(B)-(C).

Although Winner asserts that she repeatedly asked Defendant to stop sending messages to her phone, and that those requests went unheeded, she does not specify how she made these requests other than one visit she made to a Kohl's store in which she asked an employee to get the text messages to stop. This action did not comply with the terms and conditions of the program and is thus insufficient to create an injury-in-fact based on Defendant's failure to stop the texts. The parties stipulate that Defendant received a "STOP" text from Winner's phone on March 24, 2016, and that Kohl's has no record of any other request made by Winner for Defendant to stop sending text messages to her phone number. (Stip. ¶ 10.) They further stipulate that (1) when Winner followed the prescribed method for stopping the telemarketing texts, the only additional text she received was a confirmation that she had unsubscribed from the program and (2) Defendant has sent Winner no other texts. (Id. ¶¶ 11-12.) Accordingly, we find that Winner's alleged "repeated" attempts to stop the texts by efforts other than those prescribed by the program to which she consented are insufficient to establish that she suffered an injury-in-fact.

Plaintiff Jennings' experience was similar to that of Winner. Like Winner, she opted into a Kohl's text message program by texting a keyword, "SAVE07," to Kohl's in November 2014. (Stip. ¶ 14.) After she texted "SAVE07" to Kohl's, Kohl's sent her a confirmation stating that she would begin receiving seven messages per month, and referring her to the terms and conditions on Kohl's website. (Id. ¶ 17.) All messages that Kohl's sent to Jennings told her she could "Text 'STOP' to stop," but the parties stipulate that Kohl's never received a "stop" message from Ms. Jennings. (Id. ¶¶ 17, 19.) Accordingly, we find that Jennings has failed to

meet her burden to show injury-in-fact since she too consented to receiving the telemarketing texts in a manner that complied with the TCPA and E-Sign Act and never asked Defendant to stop sending her texts in the manner required by Defendant's terms and conditions.[4]

Plaintiffs argue that, under the FCC 2015 Order, Defendant never obtained their express written consent to send them autodialed telemarketing texts. They assert that the Order permits a telemarketer to send only **one** text in response to a customer's response to a call to action. See FCC 2015 Order ¶ 106 n.363.[5] Plaintiffs argue that they did not consent to any messages beyond the first one. They further contend that the first message "did not disclose that (1) subsequent messages would be automated or (2) that Winner was not required to sign or agree as a condition of purchasing any of the property, goods, or services." (Pls.' Mem. at 11.) They also argue that the first message did not contain disclosures sufficient to transform any response thereto "into a

---

[4] Because both Plaintiffs consented to receiving the text messages, the United States Court of Appeals for the Third Circuit's recent decision in Susinno v. Work Out World Inc., No. 16-3277, 2017 WL 2925432 (3d Cir. July 10, 2017), is inapposite. There, plaintiff brought suit under the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), after allegedly receiving a single, unsolicited cell phone call. Id., at *1. The court held that the allegation was sufficient to state a concrete, if intangible, harm. Id. at *5. Here, Plaintiffs' consent requires the opposite conclusion.

[5] The footnote cited by Plaintiffs states:

We note that some businesses include, in their call-to-action displays for on-demand texting programs, the small amount of wording necessary to make the disclosures required by the Commission's rules concerning prior express written consent for autodialed or prerecorded telemarketing calls. *See, e.g.*, http://www1.macys.com/shop/couponsdeals (visited Feb. 10, 2015) (disclosures under "get texts details": "By texting COUPON from my mobile number, I agree to receive marketing text messages generated by an automated dialer from Macy's to this number. I understand that consent is not required to make a purchase."). Our ruling today allows businesses to voluntarily provide these simple disclosures to consumers in a call-to-action before sending a single on-demand text in response to a consumer's request. **If the business sends more than a single text as a response to the consumer, however, our rules require prior express written consent with the specified disclosures**.

FCC 2015 Order ¶ 106 n.363 (emphasis added).

signature for purposes of the E-Sign Act" because there "was no notice that the consumer was affirmatively consenting to an electronic signature, no notice that the consumer could obtain a paper copy of such consent and whether there would be a charge, and no notice that the consumer could withdraw her electronic signature." (Id. at 12 (citation omitted).)

Plaintiffs' reliance on the FCC 2015 Order is misplaced because the events in this case occurred before that Order was promulgated. The Winner calls to action text was initiated by that Plaintiff on October 24, 2014. (Stipulation ¶ 1.) The Jennings calls to action text was initiated by that Plaintiff on November 22, 2014. (Id. ¶ 14.) Plaintiffs offer no explanation of how Defendant could be bound by an FCC Order that was not in existence at the time Plaintiffs consented to receive the autodialed telemarketing texts. Moreover, the FCC 2015 Order clearly permits subsequent autodialed telemarketing texts after the initial text where businesses obtain the required "prior express written consent with the specified disclosures." FCC 2015 Order, at ¶ 106 n.363. As Plaintiffs concede in the Stipulation that they received the disclosures, they have failed to meet their burden to show they suffered an injury-in-fact even if the FCC 2015 Order applies. We conclude, accordingly, that Winner and Jennings have failed to satisfy their burden of showing that they have standing because each suffered an injury-in-fact as a result of Defendant's actions that is likely to be redressed by a favorable judicial decision. See Spokeo, 136 S.Ct. at 1547. Consequently, we grant Defendant's Motion to dismiss for lack of subject matter jurisdiction.[6]

## VII. CONCLUSION

Plaintiffs' claims for violation of the TCPA are dismissed under Rule 12(b)(1) because they have failed to meet their burden to show they have standing to bring their claims. Since

---

[6] Because we grant Defendant's Motion on this basis, we need not address its Rule 12(b)(6) arguments.

Plaintiffs have already had a full opportunity to amend their pleading to attempt to establish standing, and have stipulated to the facts relevant to standing, we find that any further amendment would be futile. Defendant's alternative request to strike the class allegations in the FAC is dismissed as moot.

An appropriate order will be entered granting Defendant's Motion to Dismiss.

BY THE COURT:


/s/ John R. Padova
John R. Padova, J.